# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                              Case No. 07-CR-73

TINA MARIE CRAWFORD,

        Defendant.

---

**SENTENCING MEMORANDUM**

---

On May 25, 2007, Defendant Tina Marie Crawford pled guilty to conspiracy to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) and 846. The offense carries a mandatory minimum sentence of ten years imprisonment and a maximum of life. A person convicted of this offense is also subject to a fine of up to $4,000,000 and a term of supervised release of ten years to life. Because Crawford had no prior record and fully debriefed with the government prior to sentencing, she was eligible for the safety valve provision of 18 U.S.C. § 3553(f), making the ten-year mandatory minimum sentence inapplicable. In addition, prior to sentencing, the government filed a motion for downward departure pursuant to U.S.S.G. § 5K1.1 requesting a three level decrease in the defendant's offense severity score because of her substantial assistance in the investigation and prosecution of others involved in the conspiracy. Despite the benefit provided by the safety valve provision and the government's motion for a downward departure, the sentence range Crawford faced under the United States Sentencing Guidelines remained substantial– 51 to 63 months. Upon consideration of the Sentencing Commission's policy statements and other grounds for departure expressly authorized by the Guidelines, as well as the

more general sentencing factors set forth in 18 U.S.C. § 3553, I conclude that a substantially lower sentence is just and reasonable. This memorandum will set forth my reasons.

## FACTS

### 1. The Offense Conduct

The investigation of the offense, like the investigation of most drug conspiracies, began with the arrest of one of the participants for selling a small quantity of crack cocaine. Following her arrest on November 15, 2006, and presumably after being advised of the penalties she was facing, an individual referred to as CI-1 in the Pre-Sentence Investigation Report (PSIR) agreed to speak with law enforcement officers about the other individuals involved in the conspiracy and to work with the officers as a confidential informant. CI-1 informed officers that her supplier was a man named Charles McIntosh, also known as "Bullet," and that she had purchased crack cocaine from him approximately twenty times. CI-1 stated she typically would purchase three eightballs (1/8 oz.) at a time for $200 per eightball. CI-1 said that McIntosh occasionally lived with a woman named Mary, later identified as co-defendant Mary Finne, and that when McIntosh was out of town she would obtain crack either from Mary or one of several runners for McIntosh, whom she also identified. Over the following weeks and months, CI-1 made a number of controlled buys of crack cocaine under the supervision of law enforcement from other members of the conspiracy, some of whom also became confidential informants. The investigating officers learned that McIntosh had been selling crack cocaine in the Green Bay area for at least a year. McIntosh had a source in Chicago from whom he would usually purchase powder cocaine that was used to make crack. He then recruited others to store the crack cocaine for him, distribute it to his runners, and collect the

2

money received in payment. Eventually, all of the participants in the conspiracy gave statements regarding the actions of their co-conspirators. As a result of the investigation, law enforcement officers were able to determine that between September of 2006 and February of 2007, McIntosh was responsible for distributing, or possessing with intent to distribute, approximately 2,428 grams of crack cocaine.

On two occasions, January 9 and January 11, CI-1 made controlled buys in which Crawford was directly involved. Crawford's primary role in the conspiracy, however, was to monitor the drugs McIntosh kept in a portable safe and make sure all the money was there. If the amount of money or drugs was short, she would be held accountable.[1] According to Crawford's account, which I find credible and corroborated by other facts in the record, her involvement in the conspiracy did not begin until late-November of 2006.[2] She had met McIntosh at a bar in Green Bay in September and became involved in a sexual relationship with him. When she learned of his drug activity in November, she told him she would not be a part of it. McIntosh responded by holding a gun to her head and telling her she would have to die to get out of the relationship. Although she eventually moved into a domestic violence shelter, Crawford initially agreed to assist McIntosh out of fear. She asked a friend to assist her in storing the drugs in her home but later moved them to a storage facility. In January 2007, she moved into her own apartment and

---

[1]Crawford admits that on one occasion she kept $900 from the drug proceeds to pay rent and other bills without McIntosh's knowledge. If he had found out, Crawford claims McIntosh would have beaten her. (PSIR ¶ 34.) There is no evidence that she otherwise profited from the enterprise.

[2]Crawford was not mentioned by CI-1 following CI-1's arrest on November 15, 2006, apparently because McIntosh had not yet begun using her in his distribution scheme. Indeed, none of the CIs report any involvement on the part of Crawford before late November of 2006.

3

attempted to cut ties with McIntosh, but he sent Daniel Hill, one of his runners, to check on her. One night, McIntosh himself came to her apartment with a gun and a can of gasoline intending to kill her. He then proceeded to break all the phones and beat her severely, telling her he decided not to kill her because she did not cry during the incident.[3] She was later treated at a local hospital for bruises and head trauma, but declined to tell police who was responsible out of fear for herself and her children. It was at that point that Crawford moved into a domestic abuse shelter.

On February 15, 2007, McIntosh was finally arrested at the house in which he was then residing in Wisconsin Rapids following a controlled buy of nine grams of crack cocaine by CI-1. In a search of the residence conducted immediately after his arrest, law enforcement officers recovered 116 separately packaged baggies of crack cocaine weighing a total of 100 grams in a safe, along with a loaded .357 Rugar GP100 handgun and a digital scale. On March 20, 2007, a grand jury sitting in Milwaukee returned an indictment charging McIntosh and four others, including Crawford, with one count of conspiracy to distribute crack cocaine and a series of separate counts of distribution of crack cocaine during the course of the conspiracy. Crawford was not arrested until March 22, 2007, at which time she admitted her involvement and agreed to cooperate with law enforcement in the prosecution of those involved in the conspiracy. Crawford eventually entered a plea of guilty to the conspiracy count pursuant to a written plea agreement in which the parties stipulated that the amount of crack cocaine attributable to her was between 50 and 150 grams.

---

[3]Crawford's account of this incident is corroborated by Hill, who told police that McIntosh told him he intended to kill Crawford because of her effort to extricate herself from the business but had "roughed her up" instead. (PSIR ¶ 23.)

4

## 2. Offender Characteristics

Crawford, age 33, was born in Green Bay and, by her account, had a very difficult childhood. Her parents were not married, and she first met her biological father when she was 17 years of age. She was adopted by her mother's second husband as a young child, but states that her adoptive father sexually molested her for three years from age 8 until age 11. She states she then ran away from home and lived in Milwaukee for three years where she became sexually promiscuous and abused alcohol and drugs. She states she was returned to her parents at age 14, then sent to live with her maternal grandparents in Luxemburg, Wisconsin. Her parents divorced, and her adoptive father was granted custody. At age 15, her adoptive father told her she had to either get married or go into a halfway house. She states she married a man she met in Alcoholics Anonymous.

It is difficult to determine how much of this account is true. Crawford's mother, who later married one of her daughter's mental health counselors and is now a juvenile intake worker for a neighboring county, denies that her daughter lived in Milwaukee for three years. She states that her daughter was involved in treatment for drug abuse at Bellin Hospital in Green Bay on numerous occasions and ran away from home approximately four or five times. On one occasion she went to Milwaukee, but was there only a month. Her mother states Crawford was raped at school at age 13, but she and her husband did not learn of it until her daughter reported it in counseling when she was 16. She is also unaware of her former husband sexually molesting her daughter. Crawford's mother reports her daughter "has burned many bridges in the past with lies" and acknowledges they have a strained relationship and see each other only occasionally. Notwithstanding her mother's comments, Crawford has no prior criminal record, either as a juvenile or as an adult.

Crawford has been married twice, first in 1989 and then in 1995, with both marriages ending in divorce. She has five children fathered by three different men. Her oldest son, age 15, was born of her first marriage. Crawford was granted custody of her oldest son after the divorce, but transferred custody to his father when he began getting into trouble in 2005. His father recently kicked the boy out of his house, however, and he now lives with Crawford. Crawford has two children from her second marriage: a boy age 11, and a girl age 9. Crawford reports her second husband was physically abusive to her and their children, and she believes he and his brother sexually assaulted their daughter. Restraining orders are currently in effect prohibiting him from threatening, abusing or harassing them. Finally, Crawford has four-year-old twins from her relationship with a man she moved in with to get away from her second husband.

Suzette Kosnar, a family therapist who has been treating Crawford and her children since 2002, reports that Crawford carries the following diagnoses under the American Psychiatric Association Diagnostic Statistical Manual (DSM IV): Post Traumatic Stress Disorder, Panic Disorder with Agoraphobia, Acute Stress Disorder, Generalized Anxiety Disorder, Physical Abuse Victim, Sexual Abuse Victim, and Dysthymic Disorder. Ms. Kosnar states she has seen Crawford on a weekly basis since 2005, and considers her a good patient who has made significant progress in understanding and learning from her past mistakes. Ms. Kosnar also states that all five of Crawford's children have serious mental illnesses and/or developmental delays for which they are being evaluated and treated.

As noted above, Crawford abused alcohol and drugs in her youth. She underwent inpatient treatment on three separate occasions with the last occurring in 1990. She denies she is in need of treatment at this time, and since her release on bond, has submitted urine tests as directed with no

6

positives for controlled substances. There is no evidence to suggest she was using crack cocaine during her involvement in the conspiracy.

Crawford's employment record consists of various short-term jobs, except for periods when she was married and able to stay home caring for her children. Her most recent employment is with Papa John's Pizza where she began as a delivery driver in January 2007 for $6.50 per hour. Her supervisor states she is dependable, does very good work and has recently been promoted to shift manager. Because of the leadership skills she has shown, he reports she could potentially be promoted to a salaried manager position in the future.

## SENTENCING PROCEDURE

Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), sentencing in the federal courts begins with the determination of the proper range under the United States Sentencing Guidelines. But it cannot end there. *Booker* held that the Guidelines were to be advisory, and the Court's more recent decision in *Rita v. United States*, 127 S. Ct. 2456 (2007), confirms that, as far as the sentencing court is concerned, the guideline range is simply one of the several factors listed in 18 U.S.C. § 3553 that must be considered in arriving at just sentence, "sufficient, but not greater than necessary," to meet the traditional purposes of criminal sentences. The complete list of factors to be considered by the court include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed-
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

*United States v. Qualls*, 373 F. Supp.2d 873, 874 (E.D. Wis. 2005); 18 U.S.C. § 3553. I begin with the guideline calculation.

**A. Guideline Calculation**

As noted above, I conclude that Crawford's sentence range under the Guidelines is 51 to 63 months. I arrive at this range by starting with a base offense level of 32, which corresponds to the amount of cocaine base that parties agreed was attributable to her (more than 50, but less than 150 grams). Crawford qualifies for a two-level reduction under USSG §2D1.1(b)(9) because she has no prior record; she did not use violence, threats of violence or a firearm; the offense did not result in death or serious bodily injury to any person; she was not a leader, organizer, manager or supervisor; and prior to sentencing she truthfully informed the government everything she knew about the offense. USSG § 5C1.2. The resulting offense level (30) is reduced an additional two levels as a result of her acceptance of responsibility, USSG § 3E1.1(a), and another one level on motion of the government for notifying it of her intent to plead guilty at a time sufficiently early to save the time and expense of trial preparation, USSG § 3E1.1(b), resulting in an total offense level

8

of 27.  Finally, the government filed a motion for an additional reduction of three levels pursuant to USSG §5K1.1 in consideration to the assistance she provided in the prosecution of the case, which further reduced the offense level to 24.

I considered a further reduction for reduced role in the offense, *see* USSG §3B1.2, but concluded that her actions in furtherance of the conspiracy were too substantial to warrant a reduction.  Crawford not only stored drugs for McIntosh, but she also distributed the crack to his runners and collected the money from them.  She also accompanied McIntosh on trips to Chicago to buy cocaine and was directly involved in several deliveries.  To the extent her actions were the result of coercion or duress, I concluded separate consideration on that basis alone was warranted.  Her role in the offense, regardless of the motivation for her actions, was not minimal or even minor.

I also considered granting a more substantial reduction than the three levels the government had requested based on her assistance.  For while the government's recommendation for a departure based on substantial assistance is a prerequisite for such a reduction, the extent of any departure granted lies within the court's discretion.  *See United States v. Senn*, 102 F.3d 327, 331 (7th Cir. 1996); USSG §5K1.1(a).  In the end, however, I concluded that the government's assessment of the value of her cooperation was reasonable.  I note that Crawford did not dispute the government's assessment of value of her assistance and the application note to USSG §5K1.1 advises that substantial weight should be granted the government's assessment.  *See* USSG §5K1.1, n. 3.  This seems reasonable since the government's attorney and the law enforcement agents working with him are generally in the best position to assess the value of a defendant's cooperation and how it compares with the assistance provided by other defendants.  Here, it is true that Crawford fully debriefed and was willing to testify against others involved in the conspiracy.  As the government

9

noted, however, her assistance was not essential to the case. Her cooperation came immediately upon her arrest, but by that time the indictment had been returned and the other members of the conspiracy had either been arrested or were working with law enforcement.

I therefore conclude that the appropriate offense level under the United States Sentencing Guidelines is 24. Because Crawford has no prior convictions, her criminal history score is zero, placing her in Criminal History Category I. The resulting sentence range under the Guidelines is 51 to 63 months. With this range in mind, I now proceed to consideration of the other sentencing factors.

**B. Coercion and Extraordinary Family Responsibilities**

Two factors, in particular, warrant special consideration in the determination of an appropriate sentence in this case. The first is the fact that Crawford's involvement in the conspiracy was, to a large extent, the product of coercion. She initially told McIntosh she wanted no part in his drug dealing and only relented when he literally placed a gun to her head and threatened to kill her if she did not help him. When despite his threats, she withdrew, he went to her house with a gun and a can of gasoline, intending to kill her, but elected instead to break the phones in her house and beat her severely. The second factor that warrants special consideration is the impact her incarceration would have on her five children. The letters and reports submitted by health care professionals, therapists and school officials involved with the family indicate that Crawford has been diligent in caring for her children and making sure they receive the different services that have been offered to address their special needs. With no other care-giver in the picture, incarcerating Crawford would result not only in separating the children from their mother, but also from each other as they would they would likely be placed in separate foster homes. Both factors are explicitly

recognized in the Guidelines as reasons that can justify departing from the otherwise applicable sentence range.

Indeed, coercion can be a complete defense to criminal liability under some circumstances. In order for coercion, also known as duress, to serve as a complete defense, however, the defendant must establish three elements: 1) an immediate threat of death or serious bodily injury; 2) a reasonable fear that the threat will be carried out; and 3) no reasonable opportunity to avoid the threatened harm other than by committing the criminal act charged. *United States v. Fiore*, 178 F.3d 917, 922 (7th Cir. 1999). In response to the court's inquiries, counsel for Crawford explained that she had discussed the defense of coercion with her client, but concluded she would be unable to establish the essential elements of the defense. Counsel's assessment appears reasonable. The defense of coercion is not easily established. *See United States v. Gio*, 7 F.3d 1279, 1286 (7th Cir. 1993) ("A coercion defense requires evidence of '(1) immediacy of a threat of severe bodily injury or death which can be avoided only by committing a crime, ... and (2) the existence of no legal alternative to violating the law.'") (*quoting United States v. Allen*, 798 F.2d 985, 1004 (7th Cir.1986)); *see also United States v. Sixty Acres in Etowah County*, 930 F.2d 857, 861 (11th Cir. 1991) ("The requirement of immediacy of the threat is a rigorous one; [sic] and it is clear that fear of future bodily harm to one's self or to others will not suffice.") (internal quotations omitted). Although the evidence in this case shows that McIntosh initially threatened Crawford's life, he was not continually present during the time of her involvement and she made no effort to contact law enforcement and report his threats and criminal activity. Thus, it appears from the record before me that coercion would not be a complete defense.

When, as here, coercion may not be a complete defense, however, the Guidelines authorize a downward departure from the otherwise applicable sentence where duress or coercion has been shown to be a significant motivation for the defendant's conduct:

> If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward. The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions, on the proportionality of the defendant's actions to the seriousness of coercion, blackmail, or duress involved, and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be. Ordinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency. Notwithstanding this policy statement, personal financial difficulties and economic pressures upon a trade or business do not warrant a downward departure.

USSG §5K2.12.  Under this standard, I am satisfied that a substantial downward departure would be warranted.  I find from the evidence that Crawford only agreed to participate in the conspiracy when McIntosh threatened to kill her.  That her fear was reasonable was clear not only from the fact that he held a gun to her head when he first made it, but also from the action he took when she withdrew.  While it is true that McIntosh did not remain with her constantly, her reluctance to go to the police was understandable.  According to her therapist, her previous efforts to enlist law enforcement to protect her and her children against one of her ex-husbands against whom she had a restraining order were less than successful.  And of course, McIntosh had others working for him. The fact Crawford did not go to the police even after she withdrew from the conspiracy and McIntosh severely beat her strongly suggests her fear of retaliation was genuine.

Prior to *Booker*, a sentencing court's determination that a defendant had acted in part under duress or because of coercion would authorize the court to decrease the defendant's offense severity

12

score by an amount arrived at by consideration of the reasonableness of the defendant's actions, the

proportionality of the defendant's actions to the seriousness of threatened harm, and the extent to

which the conduct undertaken by the defendant was less harmful than the alternative based on the

defendant's understanding. USSG §5K2.12. But in the post-*Booker* world of sentencing, it is no

longer appropriate to attempt to quantify the degree to which a defendant's offense severity score

is decreased as a result of coercion or duress. As the Seventh Circuit recently explained in *United*

*States v. Simmons*,

> Departures were an essential safety hatch in the pre-*Booker* world because the
> guidelines were mandatory then, so that every sentence (except statutory maximum
> and minimum sentences) had to be fitted into the guidelines scheme. With the
> guidelines advisory, the departure safety hatch, constrained as it was by the
> requirement that departures be consistent with the structure of the guidelines, e.g.,
> *United States v. Castro-Juarez*, 425 F.3d 430, 434 (7th Cir.2005), is a superfluous
> way station en route to application of the more capacious statutory sentencing
> factors. In short, after *Booker*, which rendered the Guidelines advisory, departures
> have become obsolete.

485 F.3d 951, 954-55 (7th Cir. 2007) (internal quotations omitted). Thus, while I consider the

degree of coercion under which Crawford acted to be a significant mitigating factor in her case, it

does not reduce her sentence range under the Guidelines. Instead, it is one of the more general

sentencing factors I must consider in arriving at a final determination.

The same is true of the other factor mentioned above – Crawford's family responsibilities.

Unlike duress or coercion, family responsibilities are a disfavored basis for departure under the

Guidelines. *See* USSG §5H1.6 ("In sentencing a defendant convicted of an offense other than an

offense described in the following paragraph, family ties and responsibilities are not ordinarily

relevant in determining whether a departure may be warranted."). The reason underlying the rule

is obvious: "Disruption of the defendant's life, and the concomitant difficulties for those who

13

depend on the defendant, are inherent in the punishment of incarceration." *United States v. Canoy*, 38 F.3d 893, 907 (7th Cir. 1994) (*quoting United States v. Johnson*, 964 F.2d 124, 128 (2d Cir.1992)). To treat ordinary family responsibilities as a reason not to impose a sentence of incarceration would give anyone with a dependent a pass, or at least a discount, on the sentence they would otherwise deserve. But while family responsibilities are not ordinarily relevant in determining an appropriate sentence, they are a proper consideration when they are shown to be extraordinary. *Canoy*, 38 F.3d at 907.

Crawford's circumstances meet this threshold. As noted above, she has five children, all with special needs, for whom she is the sole parent providing care. According to letters received by the court from health care and social service providers within the community, she has been making a heroic effort to meet their needs. In letters received by the court she has been described as "an excellent mother" who "has been diligent in keeping appointments and looking out for her children" (Aug. 14, 2007 letter from pediatrician), "a very tolerant and good parent" (Aug. 9, 2007 letter from therapist), "the best person to care for her children" (Aug. 15, 2007 letter from family practice physician), and an important component in creating a stable and loving environment for her children (June 8, 2007 letter from Early Childhood Special Education Teacher for the twins). Moreover, it appears that no other individual is prepared to take on these responsibilities. The father of the oldest child threw him out of his house, and a state court has entered a restraining order enjoining the father of the next two oldest from contacting them because of previous abuse. The father of the four-year-old twins has been indifferent to his children and his whereabouts are unknown. Crawford has no family or close friends who would be in a position to care for the children if she was incarcerated for a prolonged period of time. According to the therapist,

14

incarcerating Crawford would result in all five of her children becoming wards of the state and being placed in separate foster homes, assuming homes can be found, since it is unlikely any one family could handle all five children. As then Chief Judge Breyer noted in *United States v. Rivera*,

> It may not be unusual, for example, to find that a convicted drug offender is a single mother with family responsibilities, but, at some point, the nature and magnitude of family responsibilities (many children? with handicaps? no money? no place for children to go?) may transform the 'ordinary' case of such circumstances into a case that is not at all ordinary.

994 F.2d 942, 948 (1st Cir.1993). This is such a case.

In addition to finding that a defendant's family responsibilities are extraordinary, however, a court should also consider whether a reasonable reduction would address the problem. If the nature of the offense and the defendant's involvement in it demand a lengthy sentence, it makes little sense to order a relatively modest reduction that will in all likelihood come too late to benefit the child. *See United States v. Wight*, 218 F.3d 812, 815 (7th Cir. 2000) ("But taking a few years off a long sentence is worthless to children and costly to the program of proportionate punishment under the guidelines."). In essence, this requires the court to consider "whether a departure is consistent with the purposes of sentencing-the need for just punishment, deterrence, protection of the public and the rehabilitation of the defendant." *United States v. Maas*, 444 F. Supp.2d 952, 961 (E.D. Wis. 2006). And that consideration again brings me back to the more general sentencing factors of § 3553.

## C. Sentencing Determination

The offense before the court is, of course, a serious one. Those who deal drugs prey upon the weaknesses of individuals and contribute to the social pathology of violence, unemployment and poverty that has become epidemic in so many of our cities. Cocaine, especially in the form of crack

15

cocaine, has been at the center of this downward spiral over the past thirty years. While I am

mindful of, and have given full consideration to, the almost universal criticism of the infamous 100

to 1 ratio between crack and powder cocaine, and the Sentencing Commission's longstanding and

ongoing efforts to reduce the disparity in which two different forms of the same substance are

treated under the Guidelines, *see United States v. Smith*, 359 F. Supp.2d 771, 777-79 (E.D. Wis.

2005), it remains a fact that cocaine is a dangerous and addictive drug that tears at the social fabric

of our communities. Moreover, many of those who seek to profit by selling it have created a lawless

and violent sub-culture that seriously threatens the safety and well-being of all, especially those

living in neighborhoods where the sale and use of cocaine is most prevalent. It is for these reasons

that those who choose to engage in such conduct are deserving of significant punishment. And of

course, as is true of every sentence for serious crime, an important by-product of the court's

sentence should be the deterrence of others who might be tempted by the hope of substantial profit

to engage in the same conduct.

For a sentence to be just, however, the court must consider more than the seriousness of the

offense of which the defendant has been found legally guilty. The court must also consider the

defendant's moral culpability for the offense – the individual's personal responsibility. It is here

that consideration of the coercion and duress under which Crawford acted comes into play.

Whatever her errors in judgment and the poor choices she made leading up to the offense, Crawford

did not willingly choose to become involved in the conspiracy. She did so only after her life was

threatened. The only benefit she appears to have received from her involvement was the $900 she

pilfered from McIntosh's safe so she could pay her rent. There is no evidence she herself was a

crack user who was paid in product or in any other manner. And when she voluntarily withdrew

16

from the conspiracy, she was severely beaten by McIntosh. Based on these facts, I conclude that her own culpability for the offense is very low.

I must consider the need for the sentence I impose to promote respect for the law. But under these circumstances, a court does not promote respect for the law by imposing a lengthy sentence. On the contrary, imposing a lengthy sentence under circumstances where it is clearly not warranted would undermine respect for the law not only by those most affected, i.e., the defendant, her friends and family, but also by fair-minded observers of the system who reasonably expect leniency when appropriate. The desire to "send a message" and deter future crime cannot be allowed to outweigh the fundamental requirement that the sentence imposed be just.

I must also consider the need to protect the public. The circumstances under which Crawford became involved in the conspiracy, however, and the fact that she placed her own life at risk by extricating herself from it long before law enforcement intervened, suggest that she is not likely to re-offend. Indeed, when considered along with the additional facts that Crawford has no prior record of criminal conduct, either as a juvenile or adult, and that she has been working hard to care for her children and obtain for them the services they need, the likelihood of re-offense is slight or non-existent. For this reason, the need to protect the public from further crimes by Crawford is low and can be met by providing a period of supervision. Crawford has been fully compliant with the conditions of her release during the time this matter has been pending, and there is no reason to believe her compliance would not continue after sentencing. Of course, if she does not comply or commits further crimes, this court would have the authority to impose various sanctions up to and including ordering her imprisonment for up to five years. 18 U.S.C. § 3583(e)(3).

17

Supervision by a probation officer would also further the important sentencing goal of insuring that the offender received necessary treatment and services to assist her in becoming a responsible citizen and avoid any criminal conduct in the future. This court has the authority to order, as conditions of supervision, that the Crawford continue to care for her children, maintain her employment, continue therapy or other treatment, and avoid abusive relationships of the kind that have placed her own safety and that of her children at risk. The letter from her current therapist indicates that the services Crawford requires can be most effectively provided in the community, as opposed to a prison setting.

Finally, I have considered Crawford's family responsibilities. As noted above, she is the sole parental care-giver of five children, all of whom have special needs. From the letters I have received, it appears she is providing a stable home and meeting their needs, while at the same time maintaining employment, with the support of her friends. For this court to impose a prison sentence, however brief, would result in severe disruption of the family and leave the children with no one to care for them but strangers. It would result in their separation not only from their mother, but also each other, since it is highly unlikely a single foster home could be found that would be able or willing to care for five children with special needs. Given the ages of the children, their special needs, and the history of abuse some of them have suffered from their fathers and paternal relatives, prolonged separation from their mother would, in the view of her therapist, cause them to "feel abandoned and victimized again."

Taking all these matters into consideration, I conclude that a sentence that would maintain Crawford in the community where she could continue to care for her children under supervision of a probation officer would be just, and would best meet her needs and those of her children, and also

18

serve the interests of the public. But because the offense is a Class A felony, straight probation is not an option. 18 U.S.C. § 3561(a)(1). And in order to impose a period of supervised release, some period of incarceration is required. 18 U.S.C. § 3583(a). It appears from the PSIR that Crawford was temporarily detained for three days after her initial appearance before she was released on her own recognizance. (PSIR ¶ 2.) Thus, she has already spent three days in custody for this offense. For all of the reasons set forth above, I conclude that a sentence of three days imprisonment is sufficient and sentence her to time served. I also order that she be placed on supervised release for a term of five years, subject to the conditions that will be set forth in the judgment. A fine is waived in view of the financial circumstances of the family, but she will be ordered to pay the $100 special assessment forthwith.

Dated this __22nd__ day of August, 2007.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

19